# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Brian Arradondo,

                     Plaintiff,

v.

City of Minneapolis,

                     Defendant.

Civ. No. 13-2488 (RHK/SER)
**MEMORANDUM OPINION AND ORDER**

Andrea F. Rubenstein, Minneapolis, Minnesota, Bert Black, Lawrence P. Schaefer, Schaefer Halleen LLC, Minneapolis, Minnesota, for Plaintiff.

Timothy S. Skarda, Andrea Kloehn Naef, Minneapolis City Attorney's Office, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Brian Arradondo formerly was a Captain in the Minneapolis Fire Department ("MFD"). In this action, he brings claims against the City of Minneapolis for discrimination and retaliation on the basis of race. The City now moves for summary judgment, and for the reasons that follow, its Motion will be granted.

## BACKGROUND

The following facts are recited in the light most favorable to Arradondo.

Arradondo, who is black, joined the MFD in the 1990's, straight out of high school. (Arradondo Decl. ¶ 2.) By 2009, he was a Captain. In that role, he was responsible for a fire rig and its crew and responded to fire and emergency medical calls. (Penn Decl. ¶ 3.) In 2009, Arradondo became interested in "riding out of grade" as a Battalion Chief ("BC"), the rank above Captain. When a member of the MFD "rides out

of grade," he does the job of a higher-ranking position; in Arradondo's case, he would be doing the job of a BC. (Penn Decl. ¶¶ 9, 11.) Since at least the beginning of 2010, the MFD has used the "Ride Out of Grade as a Battalion Chief Qualifications sign-off sheet" ("sign-off sheet") to document that a Captain is qualified to ride out of grade as a BC. (Id. ¶ 13 & Ex. 4.) A BC must sign the sign-off sheet indicating that the Captain has demonstrated proficiency in the listed areas. (Id. ¶ 13.)

In January 2009, Arradondo mentioned to his supervisor, Todd Steinhilber, that he was interested in riding out of grade, and he again asked Steinhilber to ride out of grade in December 2009. (Arradondo Decl. ¶ 7.) Though he does not specifically remember receiving a copy of the sign-off sheet from Steinhilber in December 2009, he (Arradondo) signed a performance review acknowledging he received one. (Naef Decl., Ex. 11; id., Ex. 1, 63.) Arradondo, however, did not know how to complete the requirements listed on the sign-off sheet. (Id., Ex. 1, 69.) According to Arradondo, every time he tried to approach Steinhilber, he was rebuffed (Arradondo Decl. ¶¶ 8-10, 13); Steinhilber never sat down with him to discuss the requirements (Naef Decl., Ex. 1, 65).

At the end of 2010, Arradondo began working for a new BC, Kathleen Mullen. (Id., Ex. 6, 80-81.) According to Arradondo, Mullen too never explained how to satisfy the criteria necessary to ride out of grade and would not talk to him about it. (Id., Ex. 1, 75, 79; Arradondo Decl. ¶ 14.) Mullen did email Arradondo and others on December 31, 2010, explaining the general sign-off process to ride out of grade. (Naef Decl., Ex. 12.) According to her contemporaneous notes, she also met with Arradondo on January 5 and 9, 2011, to review the sign-off sheet requirements, and she emailed him information

2

about the sign-off requirements. (Id., Ex. 18; id., Ex. 17, CITY001079-80.) That email did not include the department sign-off sheet, but rather a "cheat sheet" that she used with all her captains further detailing the 29 skills captured by the components of the sign-off sheet. (Id., Ex. 5, 50-51; id., Ex. 16; id., Ex. 1, 148.) Arradondo, however, did not understand why there were two lists—the sign-off sheet and Mullen's "cheat sheet"—laying out requirements for riding out of grade as a BC. (Naef Decl., Ex. 1, 100.) Mullen also emailed Arradondo on February 26, 2011, about a class helpful to riding out of grade (id., Ex. 20); checked in with him on March 6, 2011, about the progress he was making on the BC checklist (Naef Decl., Ex. 17, CITY001099); and emailed him on June 16, 2011, with information about BC classes (id., Ex. 17, CITY001133).

On June 25, 2011, Arradondo emailed Mullen asking to ride out of grade, saying "it is beginning to seem as if I am not being given those same opportunities as those other Captains." (Id., Ex. 22.) Cherie Penn, Assistant Chief of Administration for MFD, convened a meeting on July 14, 2011, to talk about Arrodondo's complaint, which was treated as a claim of unfair discrimination. (Id., Ex. 23.) At the meeting, Arrodondo claimed he had never seen the department's sign-off sheet; Penn gave him a copy. (Id.) Mullen said she was ready to help him whenever he approached her. (Id.) The night of the meeting, when Arrodondo was working a 24-hour duty shift that ended at 8:00 a.m. (Naef Decl., Ex. 1, 85-86), Mullen requested that Arradondo submit by 6:30 a.m. a written explanation of his allegation so an outside agency could investigate. (Id., Ex. 24.)

A few months later, in November 2011, Arradondo took the exam to qualify for the opportunity to be promoted to a BC position. (Id., Ex. 1, 132.) Prior to the exam,

3

Mullen emailed Arradondo and others twice, reminding them about signing up for preparatory classes and offering to assist anyone who wanted to study or practice for the test in November. (Id., Exs. 30-31.) Arradondo attended one tutoring session offered by the department. (Arradondo Decl. ¶ 19.)

The exam itself had five components: (1) seniority; (2) written exam; (3) ergometrics behavioral exam; (4) in-basket exercise; and (5) incident command scenario. (Naef Decl., Ex. 37.) The written portion of the exam had 100 objective multiple-choice questions pulled directly from the MFD Standard Operating Procedures manual. (Toal Decl. ¶ 6.) The ergometrics behavioral exam was a multiple-choice exam created and scored by a private company to measure desired behavioral characteristics. (Id. ¶ 7.) The in-basket exam tested the ability to handle staffing, assignments, and other administrative tasks and was graded using a detailed score sheet assigning specific points for each correct answer. (Id. ¶ 8 & Ex. 4.) The incident command scenario was a video role-playing exercise testing a simulated fireground and scored by personnel from Hennepin Technical College using a detailed scoring sheet. (Id. ¶ 9 & Ex. 5.)

The test-takers were ranked based on their scores and this list became the pool for interviewing for open BC positions. When a BC position became available, the MFD interviewed the top three candidates on the list at the time of the interview. (Id. ¶ 16.) Arradondo finished 19 of 20 on the exam and therefore was placed number 19 on the eligibility list. (Id. ¶¶ 14-15.) He was never among the top three people on the list and was never interviewed for a BC position. (Id. ¶ 18.) He claims that he would have performed better on the in-basket and incident-command-scenario portions of the

4

promotional exam if he had previously ridden out of grade.  (Naef Decl., Ex. 1, 133; Arradondo Decl. ¶ 19; Sewell Decl. ¶ 2.)

After the BC exam, Arradondo continued to be interested in riding out of grade. On December 31, 2011, Mullen emailed Arradondo and others informing them of the process for getting approved to ride out of grade as a BC.  (Naef Decl., Ex. 32.)  On February 17, 2012, Arradondo emailed Mullen saying he was still interested in riding out of grade.  (Id., Ex. 33.)  Mullen responded on February 21, 2012, that he should call her and she would make time on any shift to review any component he was ready to work on. (Id., Ex. 33.)

About two months later, in April 2012, Arradondo injured his knee and was placed on permanent work restrictions.  (Id., Exs. 43-45.)  He took disability retirement effective February 6, 2013.  (Toal Decl. ¶ 19.)  He was no longer physically able to be an active firefighter.  (Naef Decl., Ex. 1, 204.)  He became a 911 dispatcher in July 2013 at the Minneapolis Emergency Communications Center.  (McPherson Decl. ¶ 8.)

Arradondo filed a charge of race discrimination on August 23, 2011, and a supplemental charge of retaliation on July 13, 2012, with the EEOC and Minnesota Department of Human Rights ("MDHR") (Naef Decl., Ex. 39).  On May 24, 2013, the MDHR issued a finding of no probable cause.  (Id., Ex. 41.)  He filed his complaint in the instant case on August 16, 2013, in Minnesota state court, alleging race discrimination in violation of Title VII, the MHRA, and 42 U.S.C. § 1981, and retaliation and reprisal

5

under Title VII and the MHRA, respectively.[1]  The City removed the case on September 11, 2013, and filed a Motion for summary judgment on April 9, 2015.  The Motion has been fully briefed and is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The City bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to Arradondo.  Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  Arradondo may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

*1. Employment Discrimination (Title VII and MHRA)*

Arradondo brings claims for employment discrimination under Title VII (Count IV) and the MHRA (Count I).  Both laws prohibit employment discrimination on the

---

[1] A claim of reprisal is the MHRA equivalent of a retaliation claim.

6

basis of race.[2] As the same standards apply to both laws, the Court will consider the two claims together. Rasmussen v. Two Harbors Fish Co., 832 N.W.2d 790, 796 (Minn. 2013). Arradondo argues that the City violated Title VII and the MHRA under disparate-treatment and failure-to-promote theories.[3] The Court considers both in turn, using the McDonnell Douglas burden-shifting analysis for each because Arradondo does not identify any direct evidence in support of his claims. Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012). Arradondo first must make out a prima facie case of employment discrimination. Id. Then, the City must articulate a legitimate, non-discriminatory reason for its conduct. Id. at 854. Finally, the burden shifts back to Arradondo to show that reason is mere pretext. Id. Arradondo's "burden to show pretext merges with the ultimate burden of persuading the court that [he was] the victim of intentional discrimination." Torgerson, 643 F.3d at 1046.

**Disparate Treatment.** The thrust of Arradondo's disparate-treatment claim is that he was not able to ride out of grade as a BC because he was black. (Pl. Opp'n Mem., at 5 ("In the present case, Mr. Arradondo's disparate treatment claim centers on the long-

---

[2] Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). The MHRA likewise provides that "it is an unfair employment practice for an employer, because of race . . . to . . . discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. 363A.08, subd. 2.

[3] The City writes in its Reply brief that Arradondo also appears to be alleging a hostile-work-environment claim, because he asks the Court to "look at the big picture" because not every "incident during which Defendant made [Arradondo's] life miserable was itself an adverse action." (Def. Reply Mem., 4; Pl. Opp'n Mem., 6.) But Arradondo says these actions are meant to "reasonably point to an inference of discriminatory treatment," part of the prima facie case in his disparate-treatment claim. (Pl. Opp'n Mem., 7.)

continuing refusal to permit him to ride out of grade.").)  To state a prima facie claim of disparate treatment, Arradondo must show (1) he was a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination.  Jacob-Mua v. Veneman, 289 F.3d 517, 521-522 (8th Cir. 2002) (abrogated on other grounds).  Yet the Court need not consider whether Arradondo can make a prima facie case, because even assuming he can, his claim fails:  he cannot show that the City's proffered legitimate reason for why he did not ride out of grade is mere pretext.

The City argues that Arradondo did not ride out of grade because he never completed the sign-off process to be able to do so—and not for lack of opportunity.  He received the sign-off sheet numerous times, beginning in 2009.  (Naef Decl., Exs. 11 & 23.)  Once Mullen became his BC, she sent multiple emails explaining the sign-off process (Naef Decl., Ex. 12; id., Ex. 18; id., Ex. 17, CITY001079-80; id., Ex. 32); offered to help Arradondo prepare to ride out of grade (id., Ex. 23; id., Ex. 33); told him about a class that would help prepare him to ride out of grade (id., Ex. 20); and checked in with him about the progress he was making (Naef Decl., Ex. 17, CITY001099).  In February 2012, for example, Mullen replied to an email Arradondo sent her asking to ride out of grade, saying that he should call her and she would make time on any shift to review any component he was ready to work on.  (Id., Ex. 33.)  But Arradondo never took the next step to actually work with a BC to complete the sign-off process, and having failed to do so, no BC approved him to ride out of grade.

8

Arradondo contends this reason is mere pretext. He cites as evidence three deviations the City made from its policies.[4] Gibson, 670 F.3d at 854 (one way a plaintiff may show pretext is "by showing that an employer failed to follow its own policies"). But this meager evidence fails to show pretext and, moreover, fails to satisfy his "ultimate burden" of showing the City intentionally discriminated against him. Torgerson, 643 F.3d at 1046.

First, he argues that the City deviated from its policy in its handling of his June 25, 2011, complaint that he was discriminatorily prevented from riding out of grade. But he does not identify in the record a policy from which the City deviated. The most he does is cite the testimony of Toal (the HR representative) that generally, when a person makes a complaint, the complaint is sent to the chief, who gives it to the HR department for an investigation, report, and recommendation on the proper outcome. (Naef Decl., Ex. 3, 22.) Toal explained, however, that she "[couldn't] speculate" about the appropriate policy in Arradondo's case, because "each circumstance is different." (Naef Decl., Ex. 3, 23.) Having failed to identify the policy that the City purportedly violated, there is no evidence from which to conclude the City violated a policy. Moreover, Arradondo's complaint was ultimately forwarded to an HR investigator, and Arradondo failed to meet

---

[4] The only other argument Arradondo makes is that the City lies when it says he could not satisfy the physical fitness standards required of a BC; it is, he claims, "patently false" that the BC job "required physical fitness." (Pl. Opp'n Mem. 27.) The Court believes this argument is intended to show pretext on his failure-to-promote theory and it need not be addressed here. (See Pl. Opp'n Mem., 25, 27.) Regardless, the BC job announcement clearly requires a successful applicant to "[m]aintain excellent physical condition." (Naef Decl., Ex. 7.)

9

with the investigator despite the investigator's many attempts to get in touch. (Naef Decl, Exs. 27-29.)

Second, Arradondo argues that the City failed to follow its policies by <u>not</u> writing him up when he was reprimanded, which he thinks is a problem because had he been written up, he could have formally objected to the reprimands. But Arradondo never explains the type of reprimands he received—and not all reprimands must be written up. A verbal warning does need to be documented (Rubenstein Decl., Ex. 4), but "coaching and development" discussions of performance issues need not be written. (Second Penn. Decl. ¶ 11; Penn Decl. ¶ 17.) There is simply no evidence about which category these reprimands fell into, and, therefore, there is no evidence that the City violated its policies when it did not record the reprimand.

Finally, Arradondo argues that the City violated its policy prohibiting the alteration of records because, as he testified, Mullen retroactively altered his 2011 performance review, changing some "satisfactory" ratings to "unsatisfactory". (Naef Decl., Ex. 3, at 39; <u>id.</u>, Ex. 1, 137.) The City disputes that Mullen changed his review. Even if the review was altered, however, in the Court's view this deviation from policy fails to "demonstrate that the circumstances permit a reasonable inference of discriminatory animus" in Arradondo's failure to ride out of grade. <u>Gibson</u>, 670 F.3d at 856. Arradondo's argument on this point is limited to two sentences: reviews cannot be changed retroactively, and Mullen did change the review. He never explains what part of the review was changed, never identifies how the change was related to his race or his interest in riding out of grade, and never offers any other evidence from which a

10

discriminatory animus could be inferred. The Court need not find that a plaintiff has shown pretext simply because a policy deviation exists. E.g., Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 862, 871 (8th Cir. 2009) (abrogated on other grounds) (policy violation not evidence of pretext); Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 522 (8th Cir. 2010) ("[A]lthough an employer's violation of its own policies may be indicative of pretext, that is not always so.") (internal quotations omitted). Here, this deviation does not create a material dispute of fact about whether the City's reason that Arradondo did not ride out of grade was a pretext *for race discrimination*. Dixon, 578 F.3d at 872 (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (emphasis in original)).

In the Court's view, Arradondo has failed to show that the City's legitimate reason for why he did not ride out of grade is pretext and has failed to satisfy his ultimate burden of showing the City intentionally discriminated against him.

**<u>Failure to Promote.</u>** To state a prima facie case of failure to promote, Arradondo must show (1) he is a member of a protected group; (2) he was qualified and applied for promotion to an available position; (3) he was rejected; and (4) similarly situated employees not part of the protected group were promoted. Shannon v. Ford Motor Co., 72 F.3d 678 (8th Cir. 1996).

Arradondo has failed to state a prima facie failure-to-promote case. He admits that he cannot satisfy the second and third elements. Rather than arguing he was qualified for and rejected from an available BC position, he argues he was prevented from riding out of grade. This is because, he explains, his claim is not *actually* based on the denial of

11

promotion—he acknowledges that more than half of the people who took the promotional exam were not promoted—but rather on the fact that he never had the opportunity to reach the top of the promotion list because, by not riding out of grade, he did not have the experience necessary to do well on the promotional exam. (Pl. Opp'n Mem., 21.) He points to no facts supporting an argument that he was qualified and applied for a promotion to BC and was rejected.

Even assuming his argument traced the legal requirements of the prima facie case, it fails on its own terms because, in the Court's view, no reasonable jury could conclude that it was impossible to do well on the promotion test without riding out of grade. The promotional exam had five components: (1) seniority; (2) written exam; (3) ergometrics behavioral exam; (4) in-basket exercise; and (5) incident command scenario. (Naef Decl., Ex. 37.) The only criteria used for creating the promotional list for BC were these five components; whether the candidate had ridden out of grade was not considered. (Id. ¶ 11.) And in practice there was no correlation between riding out of grade and doing well on the promotion test. The top three scoring captains rode out of grade 12, 38, and 55 times, respectively, between January 1, 2009 and June 30, 2012, while the captains who had the most out of grade experience—85, 81, and 82 times in that period—scored 11, 12, and 14, respectively. (Id.)

Arradondo repeatedly alleges that riding out of grade was necessary for him to do well on the BC promotional exam. (Naef Decl., Ex. 1, 133; Arradondo Decl. ¶ 19; see also Sewell Decl. ¶ 2.) But his claims are purely speculative, relying on nothing more than his own assumptions about the system. Wood, 705 F.3d at 828. And he

mischaracterizes the testimony of others to support his claim. While Mullen and Steinhilber testified that riding out of grade is helpful preparation for <u>being</u> a BC, neither said that riding out of grade is necessary to succeed on the <u>promotion test</u>, and Mullen specifically said it does not play a role in preparing a person for the promotional process. (Naef Decl., Ex. 5, 12-13, 70.) While Elizabeth Toal, an HR generalist with the City, does agree that the kinds of things tested on the promotion exam are similar to those listed on the sign-off sheet, she explicitly denies that riding out of grade is necessary to succeed on the promotional exam; one could also learn by being observant and reading books. (<u>Id.</u>, Ex. 3, 11, 30-31.) A reasonable factfinder could not conclude from the evidence that riding out of grade was necessary to succeed on the promotional exam. This is particularly true given the actual test results, where the top three scoring candidates rode out of grade 12, 38, and 55 times, respectively, and the candidates who had the most experience riding out of grade (around 80 times each) scored in the middle to bottom of the group.

Because Arradondo fails to state a prima facie case on his failure-to-promote claim, the Court need not consider the rest of the <u>McDonnell Douglas</u> analysis. And because Arradondo fails to meet his burden on either of his race discrimination theories, the Court will grant summary judgment on Counts I and IV.

2. *Retaliation/Reprisal (Title VII and MHRA)*

Arradondo also alleges that the City retaliated against him for engaging in protected activity, in violation of Title VII (Count V) and the MHRA (Count II).[5] The same standards again apply to both claims and the Court will consider them together. Pye v. Nu Aire, Inc., 641 F.3d 1011, 1015 n.3 (8th Cir. 2011). Because there is no direct evidence of retaliation, the McDonnell Douglas framework applies. Arradondo must first show in his prima facie case that (1) he engaged in protected conduct, (2) he suffered a materially adverse employment action, and (3) the two were causally linked. Id. at 1021. Then, the City must articulate a legitimate, non-discriminatory reason for the action. Id. Finally, Arradondo must put forth evidence that reason is pretext. Id.

Arradondo claims he engaged in protected conduct by writing to Mullen on June 25, 2011 that "it is beginning to seem as if I am not being given those same opportunities as those other Captains." (Naef Decl., Ex. 22.) And he claims he suffered numerous adverse actions: a bad performance review (the Court believes he is referring to his December 2011 review), not riding out of grade, and intangible harms. Rather than determine whether these qualify as protected conduct and materially adverse actions, the Court will assume they do for the sake of argument, because Arradondo cannot satisfy the causal-connection requirement.

---

[5] Title VII provides that it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3. The MHRA likewise provides that "[i]t is an unfair discriminatory practice for . . . [an] . . . employer . . . to intentionally engage in any reprisal against any person because that person opposed a practice forbidden under this chapter . . . ." Minn. Stat. 363A.15.

Arradondo's only argument in support of a causal connection between his complaint and an adverse employment action is that "the length of time between protected activity and adverse action is often the most decisive proof of retaliation or the causal connection." (Pl. Opp'n Mem., 35.) True, a close temporal connection can show a causal connection for purposes of the prima facie case. E.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (holding that two weeks between a complaint and an adverse action is barely close enough to infer a causal connection). But here, Arradondo makes no effort to identify any facts about the amount of time between his complaint and any adverse employment action. No reasonable jury could infer a causal connection based on a temporal connection when it does not know the temporal connection. And if it is true that he refers to his employment review in December 2011, six months between the protected conduct and the adverse action is too long to infer a causal connection without additional evidence. Id. The Court will grant summary judgment on Counts II and V.

### 3. *Race Discrimination (42 U.S.C. § 1981)*

Finally, Arradondo brings a claim for race discrimination under 42 U.S.C. § 1981 (Count III). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." Ultimately, "the elements of § 1981 claims and Title VII disparate treatment claims are the same." Thomas v. St. Luke's Health Sys., Inc., 869 F. Supp.

1413, 1433 (N.D. Iowa 1994); accord Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 863 n.3 (8th Cir. 2008).

Arradondo cannot survive summary judgment on his § 1981 claim for three reasons. First, he seems to have abandoned the claim because he never addresses it in his brief. Second, while § 1981 protects rights, it does not provide a cause of action to enforce those rights; that cause of action is found in 42 U.S.C. § 1983, Artis v. Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1181 (8th Cir. 1998) ("A federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983"), and Arradondo never refers to § 1983 in his Complaint or his brief. Third, even construing his claim as being brought pursuant to § 1983, it still fails because a municipality is only liable under § 1983 if there is a policy or custom of discrimination. Id. (citing Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658 (1978)). A municipality cannot be liable under § 1983 under a theory of respondeat superior. Id. Here, Arradondo has identified no facts from which a reasonable jury could conclude that the City had a policy or custom of racial discrimination. As such, his § 1981 claim fails, and the Court will grant summary judgment on Count III.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the Motions for Summary Judgment (Doc. No. 24) is **GRANTED** and the Complaint (Doc. No. 1, Attachment No. 2) is **DISMISSED WITH PREJUDICE**. **LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: August 10, 2015

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge
